Case number 25-5113 et al. Fairholme Funds, Inc. on behalf of the series Fairholme Funds et al. versus Federal Higher Housing Finance Agency and its capacity as conservator of the Federal National Mortgage Association and the Federal Home Loans Loan Mortgage Corporation et al. Mr. Elwood for the Appellants Cross Appellees, Mr. Hume for the Class Appellees, and Mr. Barnes for the Appellees Cross Appellants. Mr. Elwood, good morning. May it please the Court, John Elwood for FHFA, Fannie Mae, and Freddie Mac. In 2012, as Treasury's previously unlimited financial commitment was about to be capped, FHFA made the business decision to restructure Fannie and Freddie's dividend obligations to avoid burning through finite funding, making circular draws, pay fixed dividends. The Supreme Court ruled against FHFA's authority under the Recovery Act's best interest provision because the agency reasonably determined that the new variable dividend was in the public's best interest, even if it was against the interests of the enterprises and their private shareholders. At unanimous holding, the FHFA acted reasonably and within its authority cannot be reconciled with a jury verdict finding the agency acted unreasonably. Put simply, a business decision that was... These are under different provisions, correct? First, that's under the APA, and this is under a contract. Why can't that by itself be a reconciliation? Because the statutory provision was incorporated in the contract. You can't look anywhere else for what that provision means than in the statutory provision, and it means the same thing both places, and it informs shareholders' expectations when a statute is put in place that is part of the contract, and it reasonably authorizes the conduct that happened here. Shareholders just can't say that they didn't have a reasonable expectation that that would happen. It was within the sweep of the statute. It wasn't a strange application. It was kind of a wheelhouse application. It was unprecedented, I think was the term? The entire situation was unprecedented. Well, that's true, too. And the court said, and this court said, and the Supreme Court said that the powers that they gave were also quite strong, and they were not out of the ordinary. This is not your grandfather's conservator. It was empowered to act in its own interests, and that, I think, defeats the reasonable expectation argument in two ways. That was true in FIRAEA, too. Sorry? That part was true in FIRAEA, also. But here, the, well, go on. But it defeats it in two ways. First of all, the shareholders were on notice that the conservator could act, could subordinate their interest to those of the agency itself and to the public, and under that circumstance, you know, they may have had a hope that they would, that their interest would be taken into account, but they had no reasonable expectation. Secondly, when you look at cases like Blaustein and Kahn v. Warburg-Pincus, the Delaware courts have held that when the contractual provisions that specify how it can be exercised, how that discretion can be exercised, there's no gap left to fill. And both of those cases involved circumstances where they said the agency, or I'm sorry, the party can act in its own interest exclusively. And that's exactly what this provision did, leaving essentially no gap left to fill. The prior decisions in this court and on the Third Circuit that read Collins as leaving a potential gap, right? You're saying that that was overruled essentially by Collins. I don't know that Collins overruled it. It basically just filled in some of the detail. It said that this was a reasonable application on facts that were materially indistinguishable. But Perry and Freeman had each said that there was room for an action under the implied covenants of the contracts, after Harrow but before Collins. But the court was very clear on page 633, Perry 2, that it was, you know, whether plaintiffs stated claims for breach of contract and breach of the implied covenant as best by the district court in the first instance. They basically said that the district court based its prior conclusion on an error of law because basically they didn't have an expectation of, they didn't have a right to dividends, they couldn't have an implied covenant claim. So they said that was wrong, do over. They didn't, you know, say that they were foreclosing other possible arguments. Like, for example, this court also remanded on this idea that you had, that they had a contractual right to liquidation preferences. And the district court went outside the four corners of what this court decided and said, yeah, but that's, that may be, you may have an anticipatory and maybe an anticipatory breach, but because it's unilateral, you can't recover on it. So clearly the district court was able to do other things. And here it's still open to it to consider other, you know, ways of skinning the cat. And one of those is the idea that, you know, they certainly, this court sent back explicitly for whether it was in the reasonable expectations of the parties. But I think you can also face it as whether there was a gap to fill. And where, where the contract specifies the party can act in its own interests alone, that is enough, that there's no more work for the implied covenant to do. And in fact, if you try to apply the covenant, it doesn't enforce the contract, it nullifies it. One reading of that delegation of discretion is that it makes all the more important, the obligation of good faith. When it says that a decision is solely within discretion, there is case law in Delaware, when it says it's solely in one party's discretion, that they have to act in good faith. But again, as I said, Blaustein and Kahn both say that when they say the party can act in its own interests alone, that specifies how the discretion can be exercised, and there's no more work for the, for that provision to do for the, for the implied covenant to do. And again, when the whole point of the Recovery Act was to allow the conservator to act in its own best interests, it does not, you know, it does not enforce that contract to say, oh, well, you've got to consider the shareholder's interest too. That is making it your father's conservator again. And it's saying that there's another source of law, you have to, just as you have to comply with both federal and state law, you have to comply with the APA and Delaware contract. But in this case, the best interest provision provides the standard for both APA and for the contract. And again, it's pretty well established under Delaware law that if the party is able to act in its own interests alone, that's enough. And that's what the, which cases are? Blaustein and Kahn versus Warburg Pincus, I think are the best instances of that. And again, it's not enforcing the contract at that point to say, oh, well, you also got to consider the shareholder's interests. It's basically undoing the whole point of the Recovery Act. So you would consider that it's impractical to, for FHA to consider the shareholder's reasonable expectations? It's not that it's impractical. It's that they don't have to, that they can act in the interest of the agency and in the public. And how does that in any way restrain the conservator? Well, it's obviously a broad, it's a broad grant of authority, but it's not so much that it has to restrain, although it does restrain, it says whose best interests you can act on, and that in itself is a restraint, but because it specifies how discretion is to be exercised, and that's where cases like Klausstein and Kahn come in, when it says explicitly, or rather when it says the party can act in its own interests alone, that's enough that there's no more work for the implied covenant to do. And what's the status of the conservatorship? It's still in place. We are now on our fourth amendment as of 2021. It's the fourth amendment. So the provision we're talking about today is no longer the governing dividend provision, but the conservatorship is still in place. In addition... What replaced it? The fourth amendment allows the companies to keep net worth. It allows you to build it up. Instead, they get what they were asking for here, which is dividends in kind. Basically the amount of the dividend that would otherwise be paid is added to the liquidation preference, but they are allowed to accumulate assets under this, beginning in early 2021. In addition, I wanted to just talk about the fact that... What would that tell us about the expectations of a current shareholder? Well, the expectations of a current shareholder, I mean, I don't know when you determine them from, but basically I think that the expectations of a current shareholder have both the third amendment and the fourth amendment baked in, which brings me to the last point I really want to make to the court. But the fourth amendment would give back an expectation of some... I don't know that it gives back an expectation. It gives an expectation that it's going to be, you know, that it's being given now. And, but I don't think the court has to really talk about what the reasonable expectations are going forward, because we're not talking about the conservators' ability to act in the future, whether we could adopt a dividend provision. But insofar as the 4617 restrains the court from doing anything that would interfere with the conservators' freedom of action going forward, we have to look down to see what exactly would be constrained if the plaintiff prevailed in this case. I think if the plaintiff prevailed in this case, it really doesn't say that much about discretion in the future, because, again, we're not talking here. Nothing we're asking the court to do here today, nothing the court has to do here today, adds anything to FHFA's discretion. It's only basically saying whether this past act of discretion in adopting the third amendment is reasonable. The... What would make us concerned, I think you raised it, that if the plaintiffs were to prevail, the effect on the capital structure of the agency would be somehow adversely affected. Well, that's certainly true under the counterclaims, under the cross-appeal, rather, where they're basically trying to undo or trying to modify the capital structure to basically buy out all the preferred shareholders and the common shareholders of Freddie Mac. Was that concern limited to the cross-appeal? Well, I mean, in terms of, like, changing the capital structure, I think that that's the principle, if I understand your question correctly, that's principally where it's allowed. But the last point I really wanted to make here is that when we're talking about those reasonable expectations, this class undeniably includes people who fought low after the third amendment was adopted and in full knowledge of the third amendment and the restrictions on the payment of dividends, and those people, you know, bought low, they benefited as the share rose, and yet they would be, class members, able to recover under this even though they, you know, weren't themselves injured. The plaintiff's answer to that is, aha, these claims travel with the shares. And I think that it is not so under both Virginia law and Delaware. I'd like to begin with Virginia. Under Virginia, well, under common law. One second, just to be clear on this, I want to be clear. So there are purchasers both before and after the third amendment, but everybody is post-HERA, correct? There are purchasers both before and after the third amendment. No, they're probably pre-HERA, pre-Recovery Act purchasers who've owned since then. But our submission is that the people who are, because this is, the class members are current shareholders when essentially, you know, when the case is all wrapped up. So it could include people who bought in full knowledge not only of the third amendment, but this court's decision, and our point is, I don't think there's any claim that those people have been injured by the third amendment, those people who purchased in full knowledge of it. It was priced in, but the idea is that it travels with the shares, and under Virginia. What does that tell us about the commonality of the class? Did you challenge that? We challenged a lot of it. We tried to get the class decertified, and in any event, that was defeated. So you anticipate that if the plan is prevailed, there would be individualized determinations? No, all that is, is that there will be, basically, the claim is that it traveled with the share, and so that they have the right to it, because they have the rights of the people. So it would be a windfall. And it would be a windfall for the people who bought, where they're already priced in, would get a windfall to be, like, a claim that, again, is based on disappointed contractual expectations. There's no precedent for saying that such claims pass to people who know perfectly well what the contractual expectations are. Under Virginia, well, there are two ways I'd like to address this, because under Virginia law, you can't, the plaintiffs can't point to any case where a chosen action was automatically transferred from Virginia law. They just don't exist. And our argument is that Virginia. There's no case either way. There's no case either way. Except we know that Virginia, in general, looks to Delaware law. No, well, Virginia looks to Delaware law, but Virginia also looks to what the majority rule is. And that is Council versus Commonwealth, 198 Virginia, 288 at 292. And there's no, well, I don't think there's any dispute that a common law shows as an action, law claims did not travel with the share. There is also case law, both the Royal Park case said that the majority rule today is that under the UCC claims don't travel with the share. And that's a Virginia case? No, that is a, I honestly don't remember what law that is. But I mean, there's no law directly on point. But the majority rule, as Royal Park says, is that claims do not travel with the share under the UCC. So I looked for and could not find any statement of the majority rule. I'll find it in that case. Royal Park, you will find it. You will also find in the Pacific Life case a statement saying that very few jurisdictions have gone the other way. In particular, I'd like to point the court to New York adopted this rule early on. They had to adopt a different statute in order to get around it. California, I think that's the Pacific Life case. Ohio, after a fairly comprehensive review of the law, that's the Cheatham IRA case. New York was getting around what? No, New York courts said the UCC, the claim does not automatically travel with the share under the UCC. So they adopted the general obligations law that allowed it to travel. The general obligations law preceded the UCC. Well, in any event, I couldn't tell you. My understanding was that it was 1950. No. But in any event, they adopted the general obligations law to get around that interpretation of the UCC and the understanding. It had to be of the common law. It couldn't have been of the UCC. Perhaps so. But in any event. It may have been of the UCC. I would think the latter takes precedence. But they wouldn't have had to adopt the general obligations law if the UCC already took care of it. And does your. The UCC came later. That's the point. After the general obligations law. Yeah. Well, in any event, we still have California law, Ohio law, and the Chetum IRA, the Ohio Supreme Court comprehensively reviewed the law. There was a very good amicus brief there, too. And what about Urdan in Delaware? That's pretty clear. I think. Well, no. Urdan was a case about dilution. And the Activision case, I think, affirmatively helps us. Because Activision said both that B1, the kind of claims that travel with the shares are things that really adhere in the share. Things like voting rights. Where it doesn't make a lot of sense for people who don't own the share to have a say in voting rights. And as a consequence, B1 and B2 class actions are usually the proper mechanism for claims that are in here in the stock. B3 claims or B3 actions, like here, usually mean it's personal, Activision said. In addition, you have cases like Sun States where, oh, the court said that another Delaware case where they said that basically, ordinarily, if it travels with the share, it's a claim for injunctive relief. Because you're trying to undo things that hurt current shareholders, not claims for damages, again, is here. That's not true with respect to future dividends. Perhaps not with respect to future dividends. But, I mean, the fact of the matter is, again, that it affects everybody differently. It's priced in differently. And so, ordinarily, it would not transfer. But, again, Virginia usually goes with the majority rule. I guess, you know, once we have the class certified, we're past that. Right? I mean, it's not going to be individualized. But, in any event, I think that the type of claims, and you certainly can't point to a case where a claim of disappointed expectations automatically transferred with the shares. Because, you know, it matters. I mean, it doesn't make a whole lot of sense to have such a claim transferred with the shares. Because it really doesn't matter so much to the current shareholder as it does matter to the person who held the shares at the time of the action. And I think that that's the difference between ERDAN and Activision. And the cases which we prefer, which are cases like Savvy Volatility, where it was, it came for a breach of- Savvy was a foreclosure case? It was a breach of contract with respect to a past dividend. But, I mean, the fact that it was- Okay. You're right. Yes. A foreclosure case was framed, I think. But, in any event, I think that that is a pretty good indication that, you know, basically if it's already kind of baked in at the time, that's not a claim that would ordinarily transfer with the shares. And that, as a consequence, it would be for whoever was the shareholder at the time of the action. Based on FHA's position, do we have to do anything with Parity 2? No. I think, you know, basically you can take Parity 2 as it comes. I think it strongly supports our position in two ways. I mean, it not only supports our position because it said, you know, you have to consider the effect of the Recovery Act and the Best Interest Provision on a reasonable expectations. But it also said, you know, as we, a point we made in our brief, which was that even before the Third Amendment, FHA was prohibited from paying dividends unless Treasury consented. And this court said that basically, as a matter of practice, that meant that only the Treasury was going to receive dividends under that arrangement, which plaintiffs have not challenged. Now, and so far as your damage is concerned, you all didn't offer really any counter to the damages in terms of the calculation. Well, I don't think we have affirmatively proposed any additional damages other than we did. We were the source of the event study that the plaintiff's expert then relied on in its, in making its own presentation. But I don't know that we actually presented an alternative. I can have an answer for you in my rebuttal. Can I ask you about that study? You commissioned the study, correct? We commissioned the study, yeah. And then the plaintiff's counsel introduced it. I believe that that's correct. You didn't have any objections about it? I can't, I don't know if we objected or not, but I mean, we did preserve the objection that basically that it didn't prove up to, you know, reasonable certainty how a current shareholder of the stock would have been damaged by the Third Amendment. Just to the report, as I recall, or at least one important aspect was the client, your argument that the price rebounded. That was, well, that was something that was right in the event study. It was the third. And also on the front end, that there were other, might have been other factors contributing to the loss on the day of the Third Amendment. That's correct. In cross-examination, the plaintiff's expert admitted that there were two elements to the Third Amendment, one of which they did not challenge, which was basically speeding up the reduction in the mortgage portfolio, essentially reducing the size of their business. And he admitted on cross-examination that he did not attempt to control for that, and that basically he couldn't have how much was one and how much was the other. I was clarified on redirect when he was asked whether anything other than the Third Amendment could have had this drastic effect. I don't think he was active. I think that they were shut him down because he didn't produce anything that said that on his expert report. So he wasn't rehabilitated on that. He didn't say anything along those lines. He had already said all the different things he had considered that went into this judgment. But he admitted on cross-examination he couldn't say how much was one and how much was the other. And absent that, the jury can't impose $812 million plus interest based on them eyeballing it and making a good instinct about that it was more Third Amendment than reduction in the mortgage portfolio. The rebound argument is something that comes out of fraud cases. Yes, it comes out of fraud cases. It really doesn't have any application. Well, I disagree because it's a statement of essentially economic principle that, you know, markets frequently overreact on the day of getting news and that over time, as they have more time to reflect on the actual implications, that the stock rebounds. And that Ross versus Walton, which is a district court decision in this district, dismissed because they basically didn't say, didn't control or didn't, there was no reason to believe that the initial drop affected the true worth of the effects of the fraud and that it's, you know, that you had to account for the tail end. Actually, the things in the study, there were so many subsequent events, some of which were favorable and some unfavorable, that it's very hard to say that anything that happened in the rebound period, if that were relevant or if it is relevant, was always indicative of discounting the effect of the third amendment. But it's still, in order to produce reasonable certainty of what caused the injury, it's our position that essentially the expert had to say something about that. And because I anticipated the other was, I will say we waived this by making certain stipulations, I just want to point out, JA4497 is where the stipulation can be found on the  And it said the defendants will not ask Dr. Mason, their expert, any questions about the price recovery. And defendants will not otherwise argue to the jury that the share price increased, increases after the third amendment mitigated damage. As you said, just to the jury. Right, just to the jury. And also that it's not mitigation. I don't think it's a fraud. Uh-huh. I like how you think. Uh-huh. In any event, if there are no further questions, I'll reserve the remainder of my time for rebuttal. So the rebound argument that you made seems plausible. I guess it seems like the kind of testimony that an expert witness on your side would have offered, but you didn't provide an expert witness to the jury? That is, I don't think we provided a damages expert. But in any event, again, this is about a shortcoming in their own testimony. And Ross versus Walton, they dismissed the case literally at the, you know, 12B6 stage because they didn't account for the rebound. And so it's not anything that we have to prove. It's the other side has to prove it to show their damages. But, I mean, you're, in a fraud case, no, there's not a fraud case. There's usually one expert for them, one expert for you. Their expert would say, look at this drop. It's because of the wrongdoing. And you'd say, oh, look, no, actually, it's not. Isn't that how, I don't understand why you didn't put. Well, it's the, the obligation is on the plaintiff in order to prove it to a reasonable certainty. And this is only one of the two areas that we pointed out. There's also the fact that they didn't unpack the, how much of the drop was because of the reduction in the mortgage portfolio and how much of it was owing to the network sweep. So those are two. You didn't even challenge the expert's methodology? You didn't raise a Daubert challenge? I can't say whether or not we had a Daubert challenge. It's separate, but it's not relevant to this case. All we're saying is that they didn't explain away certain things and that they didn't account for certain things, that these are errors in their submission. This isn't a Daubert challenge. I also want to point out that the, you know, their only Daubert argument in the, I think it was in the 50B was, you know, they said, this is really a way of Daubert argument and raised it in a footnote that was essentially unexplained. And I just want to point out that the case we cite in our own reply brief says that's not enough to preserve the Daubert type of claim. So, anyway. I'm just going to point a clarification. Are you finished? I was going to change this, so please get that. Back just for a moment to what travels with the shares. I think it's fair to say, and I wonder if you agree, that in every state that one could consult, there are claims that do travel with the shares and others that do not. No, I think the general rule is that claims don't automatically travel with the share, and that's all we're trying to say. I agree with that. Not all claims and not automatically. The big thing is the automatically part, because we're not trying to contest any case where somebody said, I'm selling you my right to this claim. It's a question whether they travel automatically. Again, a common law and the majority rule is that UCC claims don't travel automatically, and that this is not the type of claim that really inheres in the shares. The Delaware law recognizes travels automatically with the share. On that topic, how is this a standing issue? It's a standing injury because it's a question of whether or not there's injury. I think the best case on this is the Blue Bird case where Judge Mukasey said it was a matter of standing. Essentially, that if you were not injured by it, it's, you know, they're just not a matter of constitutional standing, Article III standing. Is there any at least loose analogy to a ketom where, you know, you're the assignee, show some action, and the injury? Well, I think the ketom is sui generis. And there's, you know, there's separate questions about that. I mean, I guess it's been resolved for constitutional standing purposes. But, you know, there's no, I think that if anything, the analogy works in the opposite direction, because there is a common law tradition of ketom actions. And under the common law, shows as an action did not travel with the shares. If we're trying to figure out a question of Virginia law that there's not Virginia precedent on, sometimes we would certify that question. I can imagine a lot of reasons not to do that here. But do you have an opinion on that? I don't think we're going to go to the mat on that. We're not going to really say, no, we object vociferously. I think that it's unnecessary. And I would probably add a year to a case that's already been hanging around for 13 years. And one thing I do want to point out is that in all of the cases that have involved cases traveling with the shares, I can't remember one that was certified. Everybody thought that there was enough to make an eerie guess. And I think there's enough to make an eerie guess here.  Charles. Thank you. Thank you. May it please the court. Hamish Hume for the class appellees and conditional cross appellants. Your honors, a unanimous jury found that when the FHFA agreed to the net worth suite, it violated the implied covenant in the contract by arbitrarily and unreasonably violating shareholder expectations by changing a 10% dividend to a dividend of 100% of the net worth and profits of Fannie and Freddie forever. They also found that all classes of current shareholders were harmed and that a reasonable measure of that harm was $612 million. The defendants are asking you to reverse that unanimous jury verdict based on arguments that are, number one, at war with this court's decision in Perry 2, and number two, at war with the way in which they litigated this case, the decisions they made below. This court should affirm. Your honors, I'd like to start where Mr. Elwood started on the Collins decision and its use of the word reasonably. There's an old adage that courts ought to read sentences in a case not as if they are context, as if they appeared in a statute, but within the context of the case. I think defendants are guilty of violating that adage here in the worst kind of way. The context matters. The question the Supreme Court was asked in Collins was precisely the same question this court was asked in Perry 2, which is whether the allegations by the plaintiffs described an action by the FHFA that was so patently outside the broad statutory authority that HERA gave to conservators that it fell outside the bar on equitable or injunctive relief in 4617F. That was the question. Was it so far and so obviously outside the authority of HERA that 4617F would not apply? And in Collins, the Supreme Court gave the same answer that this court gave in Perry 2. No, it was not. And if you read this court's Perry 2 decision, page 604 to 616, where this court said that these actions fell within the statutory authority, and compare it to pages 237 to 242, where Collins gave the same answer, you will see that the two courts were saying the same thing. And Perry 2, of course, remanded our implied covenant. It's on no inconsistency with the two things. In the course of making its decision, the Supreme Court said that this was the type of action that the FHFA could reasonably do. In other words, it was not so patently outside the authority of HERA. That is the extent of what it said. It said, as Judge Lamberth correctly held on joint appendix, I think it's, I'll get you to cite it in a second, but in his summary judgment decision, it was a decision in the abstract of what, whether this was the type of action FHFA could reasonably take. That's it. We know it was not a decision that the FHFA, that the merits of an arbitrary and capricious claim, for example, under the APA, would fail as a matter of law, because this was so reasonable. We know that's not what the Supreme Court was saying, because it didn't, it said it wasn't saying that. It never described its statement in that way. And the whole point of its ruling was to bar an arbitrary and capricious claim, and none was even presented there. It doesn't reference that. That is not what it is addressing. Even further afield from the Supreme Court's case than an APA arbitrary and capricious claim is a claim that the action violated the implied covenant, because there, you're even further removed from an APA claim, because you have to look at specific things you don't look at in an APA claim. You have to look at whether it violated the reasonable expectations of shareholders, and you have to look at factors that go beyond the statute, as this Court said in Paragraph 2 on page 631, including statements FHFA had made. And so you also may look at whether the action was pretextual, as Judge Lamberth correctly said, which this Court said on page 612 was irrelevant to the statutory authority inquiry. So we are at least two steps removed from the context and the question being presented in Collins, and its use of the word reasonably is no different from the way this Court in Paragraph 2 said this is the type of action FHFA could do. It could, in theory, have reasonably decided that. That's the end of the inquiry for whether it falls under the statute and is statutorily authorized and 4617F bars the APA claim. That's it. We know, and just closing on this point, we know two things for certain. We know that an agency action can be authorized by a statute and still be arbitrary and capricious. We know that from the structure of the APA and decades of case law saying certain actions are authorized by the statute but still arbitrary and capricious in the way they were taken. So we know that's true. We also know that an action can be authorized by a statute and at least potentially violate the implied covenant in a contract that the agency has. We know that from Cherry 2's own holdings. What is it about the way in which the power was exercised here that tells you that it could be unreasonable as a matter of contract, although authorized as a matter of law? Numerous things, Your Honor. For one thing, this was an unprecedented action, as all the experts testified. For another thing, when you combine the gravity of the action, giving away 100% of the net worth for all time, with the following fact, there was not a single memorandum or email even analyzing this question. The record is devoid of any, and the acting director admitted it. They never analyzed the pros and cons of the net worth suite. They never analyzed whether the circular dividend was truly going to be a problem. They never analyzed whether there was really going to be a risk of erosion of the Treasury commitment. They never analyzed whether the market was concerned. They didn't ask anyone. They didn't consult anyone. It was two people, Mr. DiMarco, the acting director, and his sidekick, Mr. Ugoletti, who was simultaneously working for the Treasury Department. They consulted no one else. They analyzed. They never analyzed it. They never asked anyone to update projections. They looked at nothing. Third, they took that action in the face of repeated good news about page 2906 of the record, a roaring recovery that was expected. Sorry, that's 2573 of the record. Page 2575, Mr. DiMarco himself told the Treasury Secretary, we don't need the net worth suite because we're going to be making profits above the 10% dividend well into the future. That's JA2575. The Treasury Department, at page 2586 of the record, in a memo preparing Treasury Geithner, Secretary Geithner, to testify to Congress. They told him to tell Congress there's no problem with the circular dividend and there's no problem with the Treasury commitment being capped. We're going to have $275 billion. That's more than enough to give market confidence. No mention that they needed the suite. But it gets even more incredible. Here's what actually happened. Between the time in June when acting director DiMarco told the Secretary of Treasury, we don't need the net worth suite. We're making profits above the 10% well into the future. In late July, the second quarter earnings are calculated. And before they're released publicly, sent to the Treasury point person on the Third Amendment, Timothy Bowler, showing this is 2906 of the record. Very important document. Showing that the profits for the second quarter were well above the 10% dividend and each enterprise was about to start building capital, rebuilding capital. And his response was, really makes sense to push the net worth suite. It was the opposite of the circular dividend problem. It was the opposite of a concern that they weren't making enough profit to pay the 10% dividend that drove this thing. It was the concern that they were going to make profits above the dividend and start rebuilding capital. And the Treasury didn't want that. In fact, at 2954 of the record, you'll see in the Treasury's own announcement of this deal that the whole goal of it is to ensure these enterprises will not be allowed to rebuild capital. Now, the FHFA says, well, we had a different idea. Look at 2933 of the record. The chief accountant, Nicholas Satriano, sends an email on the day he had a meeting with Mr. DeMarco and learns about the net worth suite. And he has an exchange with one of his colleagues. And he says, there was discussion by both boards about reversing the accounting write-down for these massive deferred tax assets, which the email doesn't say but other evidence does, were worth tens of billions of dollars, a one-time huge write-up of net worth. And he says, I don't think that makes sense because the amendment, the net worth suite, is designed to demonstrate wind down. That's the FHFA saying that, just like Treasury is saying, hey, they're making profits above the 10% dividend, really makes sense to push the net worth suite. So there was no analysis of the claimed problem of dividends below the 10% dividend, the need to take circular draws, the erosion of the commitment, the secondary market has concerns, not a single shred of analysis, nothing, not even an email. And on the flip side, you have emails basically saying this thing was driven because they were making too much profit. And they knew they were going to make too much profit because they had taken massive accounting write-downs from 2009 to 11, leading to record losses, paper losses. And what happens to paper losses when the economy rebounds and the housing market rebounds and it turns out you're way too conservative? Record profits. And you can see them. You can see that in the record too. They say we're going to have a roaring recovery, GA2573. We're going to have the golden years of earnings, GA2657. They knew this was all predictable, what would happen. And in 2013, it happened. They paid dividends. What are the dates of all the pages you just cited? Everything else I said was before the network sweep. Right. But how close in time? July. July of 2012. The roaring recovery email is maybe June or July. And the third amendment? Third amendment was August 17th, 2012. So everything I've said about- So a year later, the same year. So then, no, the same year, same year. All the evidence I gave you of what they knew and why it was predictable that they'd have a deferred tax asset write-up of tens of billions, they knew there'd be a roaring recovery when these accounting losses turned into accounting gains. They knew they were heading into the golden years of earnings. Those documents, again, GA2573 of the record, GA2657 of the record, those were all before the network sweep. And again, 2906 is when they see actual profits, the first side of this, above the 10%. And they say, oh, it really makes sense to push the network sweep. Treasury says that. And 2933 shows that FHSA shared that view. And then another piece of evidence. In 2013, the first year it took effect, it was signed in August 17th, took effect January 1, 2013. The dividends paid to Treasury were 100, under the network sweep, were $130 billion of cash. I think the claim in February 2 was $180 billion. Is that right? I don't remember the 180 number, Your Honor, but the point I wanted to make is that's $111 billion more than it would have been under the 10% dividend. Our expert analyzed this in 1220 to 1222 of the record. He talks about this. There is not a single email or evidence that anyone at FHSA expressed the slightest concern or surprise about this, none. We asked Mr. DeMarco that. So you can learn what someone's intentions were at the time, sometimes, by how they react after, is the only point I'm making there. Can you talk about the Article 3 standing issue? Yes. So, Your Honor, I think there's ships passing in the night a little bit here. There is no question that there is a conceptual difference established in the law between personal claims, like a securities fraud claim, or a court claim, or a claim that has something to do with what you were misrepresented into buying or selling the property, a personal claim, versus a claim that inheres in the security. That's especially well-established in Delaware law, but it's recognized in other cases, too, including their cases. If you look at their Con Edison case, it talks about that. If you look at their Sabby case, it talks about that. If you look at their Cheatham case from Ohio, it cites Erdogan, or maybe it cites Activision, acknowledging this principle, and it never says Delaware is some weird outlier. They keep saying Delaware is a weird outlier. There's not a shred of authority for that. They didn't cite nothing to you that says Delaware is an outlier. It's just more developed for obvious reasons. So, this clear distinction in the Erdogan decision from the Supreme Court of Delaware is the best articulation of it and the most fleshed-out articulation of it, and it says, amongst other things, that the key to a claim is whether it impacts the relationship of the share itself with the corporation. So, it's an injury to the stock itself. Dilution claims fall into this category. Breach of employment compensation plans fall into this category. Breach of the corporate certificate fall into this category, normally. And so, all of their authority about shows in action doesn't pass automatically. All of it, when you look at it, is dealing with personal claims, fraud claims, court claims, the types of things that are personal to you, and it's merely incidental that the report done to you relates to a share of stock, as I think Erdogan says, or Activision says, it might just as well be land or a car. Those personal claims do not automatically assign. Delaware says that, too. But the claims that are an injury to the stock itself that fundamentally change the relationship of the stock to the corporation, those inherit the security and they travel with the shares, Delaware says that plainly. Their own case is psyched to that principle without criticizing it. The only thing I'll say and acknowledge is we don't have a case from Virginia that addresses it either way. There's no case in Virginia that addresses the type of claim that inheres in the security and says it travels with the share or that it doesn't travel with the share. But they have no case from any state, anywhere, that addresses a claim that Delaware would inhere in the security and it doesn't travel with the share automatically. They have nothing. So I realize maybe your question was more focused on Article III, but this is the predicate for their whole Article III argument. Now, I appreciate the answer, and it's helpful, but you're right. I also want what you're anticipating my follow-up question would ask me to answer. Let's say that I buy stock after the Third Amendment. At that point, the value of that stock reflects the effect of the Third Amendment. It just doesn't seem like the Third Amendment has cost me a penny and that I get to come to court and have Article III standing? Yes, and the answer to that is actually in the portion of our briefs that deal with their argument that we didn't show harm to current shareholders, we do have Article III standing. And I'm going to answer your question, and I just want to make clear, in answering it, I also show why their whole standing argument is not jurisdictional and should be waived. I'll come back to that. But to answer your question is, when it's an injury to the stock that is inextricable to the stock, and here it's a permanent alienation of the private shares from the profits of the companies, they're saying, just to be clear, the network sweep says, no matter how much money Fannie and Freddie make, trillions upon trillions, the numbers go to the top, all of it goes to the Treasury. And by the way, that's true under the Fourth Amendment, too. It just, the cash builds in the company, but every cash or profit they make becomes an increase in the senior preferred stock liquidation preference. And this was before the jury in the trial. This Fourth Amendment isn't new from the trial. It was presented. It's just a different way of doing the net worth sweep. It gives them the liquidation, the senior preferred stocks principle, if you will, the liquidation preference, goes up by every penny of net worth. So it's an injury to the stock that never goes away. It doesn't matter what you do with that stock. It's impaired because the network sweep says, yeah, you think you own the stock, but actually you're alienated from the profits of the company. And when that kind of injury is done, it injures anyone who owns it, anyone who owns it. If you own that stock today, okay, if you went out and bought it today, sure, I take your point, and I'll come back to this expectations point. You will have bought something that is permanently alienated and that cannot participate in the profits. That means that you are, in fact, injured because that stock can never be what a true share of stock is supposed to be. So you have injury. And you also know, the other thing is not only is the net worth sweep still in effect, you also know that the net worth sweep has caused the companies to send Treasury all these massive, over $151 billion of excess dividends above what it would have sent under the 10% dividend. Could a member of the class have, does the class include someone who bought the stock after the Third Amendment and sold the stock before the complaint? I just want to make sure I got that. Could you repeat the question? Someone bought the stock after the Third Amendment and then sold the stock before the suit was filed here. The classes are defined as the current shareholders. Okay. So no. And it's, I think another way of looking at this is, and Judge Lambert says this brilliantly in denying their motion, their 50-day motion at the first trial. The defendants are trying to get you to confuse the injury here with the measure of damages. The injury is to the stock. As he says, the drop in stock price is not itself the alleged injury. This is the JA 525. Judge Lambert says the alleged injury is that the network suite effectively eliminated the dividend rights that came with the shares as they were originally issued. In other words, when someone buys a share in a company, they're purchasing a bundle of rights. And plaintiffs are arguing here that the network suite removed one of the most valuable sticks from that bundle. That's a type of claim that travels with their shares. The drop in stock price is just a measure of damages. That's the key to understanding why it's not about whether you bought or sold at a gain or a loss. It's the fact that you own stock that is impaired. That gives you Article 3 standing. It's impaired by the existence of the network suite, and your harm is confirmed by the effects of the network suite transferring this extra $151 billion. It would be worth more today if the network suite were undone or remedied in any way. But you would have paid more for it. But then you wouldn't have had it. Imagine that I bought the stock after the Third Amendment, and I held on to the stock, and nothing changed afterwards. This is a hypothetical, obviously. So the values stayed exactly the same. And then this verdict comes in, and there's a judgment, and I get paid. And then I sell the stock for the same price I bought it for. That just seems like such a windfall for me. And I get that you're saying, well, it's kind of a stock, not the person. But stocks don't file lawsuits and have standing under Article 3 of the Constitution. It's the person who does. Sure. And to be clear, all of our class representatives owned their stock before the network suite and still own it today, just so you know. So in terms of Article 3, all of our class representatives. Well, but not the class members. The class is, well, that may be relevant. I'll come back to that. The other thing I want to be, I really think the disconnect we're having does boil down to the fact that the injury we're complaining of, as Judge Lambert said, repeatedly, but including at JA 525, is not an injury of buying high and selling low. It's not an injury based on the stock price. The stock price became relevant only as a reasonable measure. The injury we're claiming is that everyone who owns this stock owns an impaired stock. And you may be right in terms of the intermittent trading in the stock, but if it weren't for that, people would have been hurt even more. This don't get me. I get that you're saying it's an impaired stock, but, like, you know, you'd have an impaired car. Like, if you buy a lemon and you know it's a lemon when you buy it, it doesn't seem like you're injured because now you own a lemon. Well, again, I think what I would try to do then is take you back to the Supreme Court's Delaware decision in Erdogan, which says that the plaintiff there, who were in Activision, sold the stock and then continued to sue. And they said it's not a personal claim. When you sold that stock, you lost your claim. It went with the shares. Nothing about that decision had anything to do with the price paid for the stock. It's just the concern you're having is foreign to the analysis of this well-developed Delaware law for when a claim travels with the shares. And I really want to emphasize how important Erdogan is and that no case from any other state has criticized it. They haven't found one. And if you shepherdize it, you'll find it followed all over the place, including in at least one California case applying California law. So that's the central concept here. And I think just to give them the point is illustrated by the market and the shares of bankrupt companies that are hoping to go through recovery and reorganization. It is illustrated. It's consistent with that. It happens all the time. Patent gave us a couple of years ago. That's right. It's an active market and shares that may be worth nothing and they may be worth a lot. It's true of Russian bonds, Zaris bonds, Argentine. Now, that's all debt rather than equity, but same idea. I think that's a federal assumption of the state debts of the American Revolution preceded by a feverish market in those expectations because soldiers had sold off their script thinking that it would never be worth much. So I think it's speculators who thought it might be. Well, I think that's correct. And I think a decision that doesn't recognize that does real risk of harming how financial markets work and that you do get the rights and the shares, including claims that inherit the security. And if it weren't for that, I think it would really disrupt how financial markets work. The Delaware law being so well-developed on this point. Now, obviously, you're here to hold on to your jury verdict, but as to the individual damages, restitution damages seem to be prohibited by 4617. Judge Childs, my colleague, Mr. Barnes, is going to address the cross appeal on reliance restitution. I do just want to note, we can do join that condition on the judgment not being disturbed, which we think is the right result. If Judge Lambert had allowed the reliance damage claim to go forward, we could have presented both theories. So we shouldn't lose the theory we were allowed to present. We should be allowed to go back and present the theories Mr. Barnes is going to- And why didn't you cross appeal? We did. We joined the cross appeal. We were simply- So was that brief on your behalf as well? Yes. We filed a jointer notice saying- In this court, is the Berkeley brief one you joined? Yes. Okay. Thank you. Just with the condition that we don't want to disturb the existing judgment. Yes, of course. It's a conditional jointer. Your Honors, if I may have a little more time, I'd just like to address one or two things that came up in Mr. Elwood's argument. 4617F, barring the cost. He didn't start with that, but their brief starts with that. Very briefly, Judge Lambert held in 2014, in his original dismissal, that it allows damage claims. They didn't appeal that. This court also made that decision on page 631 when it remanded our implied covenant insofar as it seeks damages. And on page 613 to 14, especially emphasized that in response to accusations from the dissent about how the majority was disregarding the rule of law, Judge Brown's dissent, the majority said, what do you mean? We were remanding the claim. We're only talking about certain remedies being prohibited. You can seek damages, and we're remanding this claim on damages. So it's a holding of this court that can't be disturbed. And Collins does nothing to change it. Collins was purely addressing an APA injunction claim, just like this court was. In fact, it even calls 4617F an anti-injunction claim. Let's read the parties as having agreed that whether you call it equitable or legal, whatever it is, it's a functional question of whether it interferes with the conservators. I don't think it does. Yes, I think it's whether it's injunctive relief versus damages is the distinction, not necessarily any other labeling, which is what Jacobs, the case they rely on from the third circle. I think the phrase we used was injunctive declaratory or other equitable relief. That's exactly the phrase you used on page 612 of your opinion. And we agree with that, whereas a damage claim is different. And every court has said that, even the case they rely on, Jacobs says that. On page 895 of Jacobs, it says most damage claims are okay, including breach of contract claims, and it cites Tipperary too. The only thing that was different in Jacobs was the claim that there was a disgorgement of every single penny paid under the network suite. And the third circuit said, yeah, that's basically the equivalent of injunctive relief, so we're going to draw the line at that. But that's not this case. This case is a damage claim equal to less. The verdict is less than one half of 1% of the excess value transferred to Treasury, $151 billion of excess value, a verdict before interest of $612 million. So it's very different from disgorging every single penny. A final point is there is law. This wasn't cited in the briefs. A prior panel decision, when addressed by a later panel in the same case, should be especially mindful of the law, not just the law of the case, but the law of the circuit doctrine. And an intervening Supreme Court decision should not be read to change that unless it's clearly eviscerating. Mr. Farr, one more question, going back to our previous session. Do you actually know the proportion of damages that involved post-sweep purchasers? We don't know that. The question is, if you take the class today, what percentage bought post-sweep? That was not a point developed. If you'll allow me to just use that as a launchpad to answer a question, a similar point, that this whole issue of standing, which I think is not jurisdictional for the reasons I've given, I know we've addressed that, the defendants not only stipulated to class certification, the judge, this didn't come through clearly enough in our briefs, the judge was not willing to accept the stipulation. He's like, this is class certification. I don't let you just stipulate. And so, the parties conferred, and this is ECF 135 of the class docket below, we said what we want, instead of a stipulation that treated our motion as withdrawn, treat our motion as filed, and the defendants asked us to narrow the certification. We sought it under all three subsections of B, B1, B2, B3. They said, narrow it to B3, and you can say we don't contest it. We don't oppose the motion. And our motion made clear that it was premised on the idea that the claims traveled with the shares. So, if I go to ECF 135, I'll find all of this? You'll find that they don't oppose our motion for class certification. And then you can look at our motion, which I can give you the JA sites for, but our motion makes clear that it's based on traveling with the shares. While you're looking for that, I'm just going to check and see if any of my comments have any more questions. Yeah, it's JA 4462 and surrounding pages is our motion. And the order is in JA 2216 to 17 is the relevant pages. Okay. Your Honors, one last piece very quickly. Mr. Elwood, on this implied covenant discretion point, we cite pages on page 27 that acknowledge that it's precisely when a lot of discretion is conferred that the implied covenant is most important. He said, no, look at Kahn and Blaustein. Please, Your Honors, read Blaustein, not their brief on Blaustein. They give a very misleading description of Blaustein. It doesn't talk about a provision in the contract. Okay, I was going to cut you off there. I appreciate it. That issue is well briefed, as were almost all the issues. So, I appreciate it. I won't let you go on a long time because it's a complicated case. So, I'm grateful for the brief. Thank you, Your Honors. Thank you. Good morning, Your Honors. I'm Brian Barnes for the Berkeley Cross Appellants. I'm principally here to talk about restitution and reliance. But given some of the colloquies with other counsel today, one thing I just want to point out factually is that many of the shares that are the basis for Berkeley's lawsuit are shares that it owned before the financial crisis. So, these are shares that Berkeley purchased going back to 2005, 2006, 2007 and still owns. And I just think that's an important point to keep in mind that there are shareholders involved in this litigation that have owned all along, even going back before HERA. With respect to restitution, obviously, the district court didn't let us pursue restitution because of 4617F. And the point I want to emphasize here is that we are not asking the courts to do anything by way of ordering the defendants to do anything other than pay money. The restitution remedy, the only effect that it has in terms of what the defendants would be ordered to do is pay money. Now, we recognize that as part of the logic of the restitution remedy, there would be a corresponding release of the defendants' ongoing contractual obligations to Berkeley. But that does not restrain or affect, within the meaning of 4617F, the conservators' exercise of this authority. Releasing the conservator and the GSEs from a contractual obligation is the opposite of restraining or affecting the conservators' exercise of its statutory authority. Even if the court order just said, pay money, would the next thing that is legally required to happen be a sale of shares? In other words, yeah, like an elimination of the shares? Well, I think there's an important distinction there, Your Honor, between a sale of shares versus an elimination of shares. The functional consequence of restitution here would be effectively the extinguishment of the shares because the contractual obligations of the defendants to Berkeley would go away. But I would submit that that's very different from a scenario where a court directs the conservator to sell or purchase some kind of asset. And that's cases like this court's decision in Freeman. It would alter the capital structure. It would alter the capital structure, Your Honor, but what I would submit is that that conceives... What does that mean? You mean the number of shares outstanding would be reduced? That's exactly what it means. It means the number of shares would be reduced. But critically, what we would not be having the court do is order the defendants to... Once the number of shares are reduced, would Fannie and Freddie then need to take additional actions to make the ratio of, I don't know, debt and cash? I don't understand how it all works, but my impression is that there are laws that require them to have a certain equity ratio. I think those laws are suspended during conservatorship, but regardless, it is true that if we got the restitutionary remedy we're asking for here, there would be accounting consequences for the books and records of Fannie and Freddie. The SEC filings would reflect a different number of outstanding shares of these junior preferred shares. But that is not really meaningfully different from a scenario where a court orders the defendants to pay money, and the defendants, in order to fund the judgment, they have to go out and borrow additional money to pay the judgment. That's going to show up in the accounting records as well. Is it true that we're talking about $48 billion? That is true, Your Honor. One thing I would note is that this is, you know, basically what we're asking for here is it's a large amount of money because it's a large amount of money that the defendants raised when they issued these shares. The other thing I'd note... Yeah, but putting aside the connection, the legal reasoning that gets you to your argument for restitution, the result would be, sorry, I'm asking, would not the result be that you would be compensated to the extent that you paid for the shares? We'd be compensated to the extent we paid for the shares, less dividends received on the shares. And so the calculation is a little different series by series, depending on the amount of dividends that have been paid. And so if you paid $100 to the shares, but when the Third Amendment was adopted, the shares had been diminished in value by 93 percent. And so the market value was seven. You would nonetheless be receiving $100. That is the logic of the restitutionary remedy, Your Honor. And I would submit that that's not so different from the investors back, as Your Honor referred to earlier, in the Revolutionary War times who bought up Revolutionary War debt at a steep discount. And ultimately, those investments paid. But the difference is that your claim sounds inequity. We don't think the claim necessarily sounds inequity. That said, we don't think that the distinction between law and equity matters here. What matters? Insofar as the remedy is inequitable, it does. Well, that may or may not be right, Your Honor. I point the court to the second restatement on contract, Section 373, comment D, that talks about losing contracts and whether you can get restitution on a losing contract. That restatement takes the position that for losing contracts, there's not a problem in terms of, you know, the remedy being inequitable. Here, we don't think the remedy is inequitable. The government was able to extract $151 billion more. If your objection is to the Third Amendment, as I understand it is, and the Third Amendment confiscated your property when it was worth $7,000, not $100,000, I do think you're having difficulty with a district court sitting inequity. Well, that's an issue that obviously the district court didn't reach. We don't think that that's an issue that the Court of Appeals ought to decide in the first instance. Again, these shares were ultimately issued by Fannie and Freddie. Most of them, they raised $25 a share. The damages award from the jury amounts to, for the series that were $25 a share par, something like $0.61 or $0.62 a share. And so, to the extent that there's a windfall here, we think the windfall is going to the government, which it was able to extract $151 billion out of these companies that couldn't have otherwise gotten, absent the net worth sweep. The district courts say, I guess it was with respect to rescission, that the result, the remedy would be inequitable. The district court suggested that with respect to reliance. Again, we don't... Reliance, thank you. Right. We obviously don't agree with that view, but the district court didn't reach this question of what windfall with respect to restitution.  Although it's hard to see why it would be a difference when the numbers are essentially the same. Well, and there's also a question at the threshold of whether there's even an appropriate sort of windfall inquiry as part of the restitution analysis. We don't think there is. And again, I just point the court to that. It's not part of the restitution analysis. It's a separate equitable consideration. We think the restitution remedy, our entitlement to get our money back fundamentally, or the successors in interest to the people who originally purchased these shares for $25 a share, doesn't depend on that sort of windfall analysis. And again, second restatement on contract section 373, I think strongly supports that. 373? Yeah, comment B. But what does Collins say about the equitable claims? Well, Collins, neither the Supreme Court's decision in Collins nor this court's decision in Freeman had before it the type of remedy that we're specifically asking for here, which is a remedy where the only order that's directed to the defendants is an order to pay money. There's just a corresponding release of contractual rights on our side of the V. So that's just a—we would submit—the key inquiry under Collins under 4617F is, is the court ordering the defendants to do something other than pay money? And here the answer is no. I can see if we have any more questions, Judge Charles. Oh, your reliance damages, are you still fighting for those? We're still pressing the reliance argument, Your Honor, and there, you know, we've spent some time dwelling on the concept of a windfall. The way reliance damages deal with the windfall problem is the defendants would be under a reliance theory entitled to come into court and prove, okay, this would have been a losing contract. Here's how much you would have lost. It's just that the burden is on them rather than us to make that showing. And we think this is really a prototypical case. It seemed more like that was a discretionary decision by the trial judge about how late you brought up that claim. Well, we brought up the claim exactly when the federal rules required us to. We did exactly—in trying to raise the claim, we did exactly what we said we would do in our initial disclosures. So I point the court to JA 194 where it was literally exactly the thing that's contemplated there is what we tried to do. The other thing that's important to keep in mind here is just the sequence of events. The summary judgment opinion that said we couldn't present our flagship theory of expectancy damages came after the pretrial statement was due in the case, just right on the eve of trial. And it was— The first trial, Your Honor. That's correct. So it was within five days of when the district court issued a summary judgment opinion that we said, okay, our flagship theory of expectancy damages, you know, we haven't been permitted to present it to the jury, and so we want to use our fallback theory of reliance damages. Thank you, Mr. Holmes. May I please report? Listening to Mr. Hume talk about the evidence that was introduced at trial and listening to him discuss the case, I was put in mind of the complaint in columns, which uses pretext and actually says pretext in as many words on how the case was litigated throughout. Both this case, Perry 2 itself specifically addressed this issue that it was pretextual, that it really wasn't done for the best interests of the companies, and Collins specifically addressed that. You can pull the complaint off of the Supreme Court's website. You can see how it was addressed at argument there. That complaint, that entire case was soaked in allegations of pretext, and same here. This court addressed the pretext discussion on page 612, 611 and 612, and it said, the stockholders cite nothing, nor can we find anything in the Recovery Act that hinges FHFA's exercise of its conservatism discretion on particular motivations. Shareholders were on notice that they were entitled to act, basically they were able to act in the public interest, and they could subordinate their interest to them. You know, all that they approved is that basically, you know, there was, they basically said, aha, this was done for some other reason. But all of that was before this court, both in Perry 2, and it was certainly before the Supreme Court in Collins, and it didn't basically undermine the decision. The reason why that matters is for two. I mean, like, for two reasons. Again, the shareholders knew that the FHFA was able to act in its own interests. In addition, you know, Mr. Hume may have said that we misrepresented Blaustein, but he didn't say that about Kahn, and Kahn made clear that if you say, if the contractual obligation says a party can act in its own interests alone, that eliminates the implied covenant, and that is precisely what happened here. I would like to now ask, subject to the court's questions, head on to this issue of standing and whether it travels with the shares. First of all, to answer Judge Ginsburg's question earlier about the Royal Park and the majority rule, this is on page 49 of our brief. Quote, the majority rule is that there is no automatic assignment of an accompanying litigation right or claim when transferring property, unquote. That's Royal Park at page 398. Now, Mr. Hume says that basically, that's for personal rights, and it's not for rights that adhere in the share and the relationship of the people to the shareholders to the company. But Activision, I think, said it most explicitly, and this is true of the Erdman case as well, that those are claims, things like voting rights. And of course, voting rights matter to the person who holds the share at the time, because, you know, you want that right to vote. And as in some states, it says those are normally done through injunctive relief, not through damages remedies. And, you know, the idea that it's anything other than a personal right, when you're claiming that basically the value of the stocks drop because of action that's already been taken, that's the sort of thing that is a personal right. It's like savvy volatility, where it's a breach of contract for something that has already happened. Judge Ginsburg mentioned an analogy to bankruptcy. Can you talk about that? I have to say, I didn't quite follow that, because, I mean, the idea is, though, that, you know, basically, whether you have, you know, the right to it, and whether it's a personal claim. And, you know, like, I don't know enough about bankruptcy. But, I mean, the point of it is, the point of our argument here is that if the claim goes to anybody, it goes to the people who bought the stock, not knowing if the network sweep and then sold it. Now, clearly, they can transfer it. It just doesn't transfer automatically. Now, let me see here. And also, Erdan was a dilution claim. So, again, it has to do with the stockholder value. I would like to talk about this idea that we somehow waived this by stipulating to the class certification. Class certification happened after the judge had already decided that the injury travels with the share or the claim travels with the share. We're not supposed to, you know, dig in our heels and never let anything happen ever again in a case. It is at war with that. And in addition to that, when we stipulated, we reserved the right to argue that individual class members were not injured, which is what we are saying here. When the judge, when essentially their claim was narrowed from a claim for dividends, including future dividends, things that would matter a lot to current shareholders, to a claim of lost value that occurred at the time of the network sweep, we immediately moved to decertify the class. And the judge there didn't say, you waived it. He just said, no, you're wrong on the merits. And if you look at the 50-bean motion, he denied that on law of the case with an air of impatience because he was tired of hearing the argument. So, the idea that we somehow waived this, I think, is simply not so. And if there are no further questions, we'll rely on our submissions. I do have one question that was mentioned in the topic that was referenced earlier. Do you know if Fannie and Freddie are exempt from Dodd-Frank while they're under the conservatorship? I do not know. But, I mean, on that, on the counterclaim examples, I mean, the idea that it's not just sort of some sort of bookkeeping entry. I think the logic of their explanation is that there were basically Freddie Mac, it would buy out all of the preferred shareholders and all the common shareholders who didn't opt out, which would mean basically what was previously a public corporation would now be essentially a government corporation with a handful or however many opt-outs there are of individual shareholders. And the idea that changing these companies from public corporations, as they have always been, it was part of the goal of getting appointed to conservatorship, is to preserve their role as public corporations and to convert them to government-owned entities with a little bit of common shares. And Fannie Mae is just, I think, kind of ridiculous. Of course, that is going to affect the exercise of the conservative shares. You know, there are still billions of dollars of worth there. Those shares closed yesterday for $8. That's a 2,200% increase from before the Third Amendment. And $8 for Fannie, $7 for Freddie. So, I mean, like, I wish that most of my investments would do that well. Thank you. Thank you.
judges: Walker; Childs; Ginsburg